**NEWHARD, COOK & COMPANY, Appellant,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, n/k/a Cigna Property and Casualty Company, Appellee.**

**NEWHARD, COOK & COMPANY, Appellee,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, n/k/a Cigna Property and Casualty Company, Appellant.**

Nos. 90–1293, 90–1359.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 12, 1990.

Decided April 12, 1991.

Lewis Mills, St. Louis, Mo., for appellant/cross-appellee.

James McDaniel, St. Louis, Mo., for appellee/cross-appellant.

Before MAGILL, Circuit Judge, HEANEY, Senior Circuit Judge, and BEAM, Circuit Judge.

HEANEY, Senior Circuit Judge.

Newhard, Cook & Co. appeals from a district court order denying Newhard coverage under a fidelity policy for losses sustained because of the fraud of an employee. The defendant, CIGNA Property and Casualty Company, issued the fidelity policy to Newhard. When Newhard submitted a claim to collect on the policy for losses precipitated by the fraud of an employee, CIGNA refused to cover the losses, claiming that under the terms of the policy, coverage for the employee in question had terminated prior to the fraudulent act for which Newhard seeks indemnification. Because we agree with the district court's conclusion that bond coverage for the em-

ployee in question terminated prior to the acts underlying this case, we affirm its decision. We base our decision on the termination clause alone and decline to comment on the other grounds advocated by CIGNA Property and Casualty Company for denying coverage.

## FACTS

### I.

In January 1982, Insurance Company of North America, now known as CIGNA, issued Newhard a broker's blanket bond, which expired on January 16, 1985. Among other forms of economic loss, the bond indemnified Newhard for loss incurred because of its employees' dishonest or fraudulent acts. According to Section 9 of the bond, insurance coverage for a specific employee terminates "as soon as the Insured shall learn of any dishonest or fraudulent act on the part of such Employee...." This termination clause appears to be a standard provision in fidelity bonds. Indeed, the parties agreed to use Brokers Blanket Bond Standard Form 14, as expressly required by Missouri law. *See* 15 CSR 30–51.080(3) (repealed 1987).[1]

Newhard, Cook & Co. is a securities broker and dealer. It employed Russell Phipps as a broker in its Long Beach, California office from 1979 until December 1983. It is undisputed that when the bond mentioned "employee," Phipps was included in this reference.

In December 1985, Mary Louise Muncy, a client of Phipps, filed suit against Phipps and Newhard, alleging deceit and misrepresentation. The transactions underlying Muncy's suit occurred in July and September of 1983. Muncy's claims were submitted to the National Association of Securities Dealers (NASD) for arbitration in January 1986. The NASD arbitration panel awarded Muncy $244,000 and ordered Newhard to pay this amount. Newhard in turn reported this claim to CIGNA. After an investigation of the claim, CIGNA disclaimed coverage pursuant to the termination clause in the policy which states:

"This bond shall be deemed terminated or cancelled as to any employee ... as soon as the insured learn of any dishonest or fraudulent act on the part of such employee." In response, Newhard filed this suit in federal district court.

### II.

On at least four occasions prior to the fraud which gave rise to this case, clients of Newhard's alleged that Phipps had engaged in fraud and misrepresentation with respect to their investments. Each of these allegations were brought to the attention of Joseph Reed, a vice president for Newhard in charge of its Long Beach office.

In January 1983, Reed met with a couple concerning their allegation that Phipps had deceived both them and another couple. Later in that same month, the attorney for the couples wrote Reed to confirm and specify their complaints and to request relief for the damages they suffered. In May 1983, Newhard paid the couples eight thousand dollars in full settlement of their claims. Newhard then fined Phipps to recover its loss.

In February 1983, Newhard propounded interrogatories to a client who was suing the brokerage firm. While answering Newhard's interrogatories, the client alleged fraud and misrepresentation on the part of Phipps. In November 1983, the client added Phipps as a defendant to the client's action.

In March 1983, another client sued Newhard and Phipps for fraud. Attached to the suit was a letter drafted by Phipps on Newhard's stationery purportedly structuring a limited partnership offering. This proposal was unauthorized and only came to the attention of Reed when the suit was filed in March 1983. Reed characterized Phipps' unauthorized use of company letterhead as "at best, deceitful." In either late 1982 or early 1983, the victim of Phipps' fraud commented to Reed that if the police knew what Phipps was doing,

---

1. Newhard is based in St. Louis, thus the relevance of Missouri law.

they would be very interested. Newhard later settled this suit

By mid–1983, Reed learned that Newhard had been sued by yet another client. In late 1983, Reed received a copy of the settlement agreement between this client and Phipps. The settlement agreement provided that Phipps would pay $160,000 to the client in exchange for the release of any claims against him. Phipps' salary at that time was approximately $40,000.

## DISCUSSION

### I.

■■■ Members of the board or employees of the insured must be "aware of the true nature of the events which have given rise to the allegation" in order to trigger a termination clause in a fidelity bond. *General Finance Corp. v. Fidelity & Cas. Co. of New York*, 439 F.2d 981, 987 (8th Cir. 1971). Here, the fraud for which Newhard seeks indemnification was brought to its attention after Newhard, via its vice president Joseph Reed, had been notified of at least four other occasions of similar conduct. These earlier complaints were not merely the frustrated rumblings of clients upset over investments gone sour, but specific claims of deceit and misrepresentation on the part of Phipps.

An attachment to one of the complaints against Phipps and Newhard revealed to Newhard conduct by Phipps which Newhard's vice president Reed characterized as "at best, deceitful." Without authorization, Phipps issued a purported limited partnership offering on Newhard's stationery to one of Newhard's clients. The client claimed that it relied on the contents of this offering and that neither Newhard or Phipps fulfilled the obligations contained therein. This unauthorized offering was the act which Reed characterized as "at best, deceitful." When the insured's own vice-president describes an employee's conduct as deceitful, the insured has knowledge of dishonesty and fraud on the part of the employee. Based on Reed's admission that Phipps acted deceitfully and on the fact that Newhard knew of the conduct

prompting this characterization prior to the time that Phipps defrauded Muncy, we hold that the termination clause had been triggered prior to the conduct which formed the basis of Muncy's claim against Newhard. This occurrence convinces us that Newhard had learned of the dishonest and fraudulent acts of Phipps prior to his misrepresentations to Muncy. Other events support our conclusion.

Collectively the law suits suggested the nature of Phipps' conduct. In addition, Newhard opted to settle the suit brought by the two couples who accused Phipps of deceit and misrepresentation. Perhaps more telling than the settlement was Newhard's decision to fine Phipps for the cost of settling with these parties. The settlement preceded Phipps' fraudulent conduct with regard to Muncy, and while the record is unclear, it appears that Newhard fined Phipps prior to his fraudulent dealings with Muncy. Newhard argues that Phipps did not actively deceive these clients but was just confused by their foreign accents. The complaints of the clients do not support this defense. They are convinced that Phipps misled them as to the nature of their investment, the date on which their investment began earning interest, and the fact that their investment never appreciated. The settlement between these clients and Newhard did not require Newhard to admit liability. Consequently, ascertaining whether the operative dynamic in Phipps' dealings with these couples was misunderstanding or deceit is difficult.

No such confusion, however, clouds the earlier discussed incident, after which Newhard's own vice-president characterized Phipps' conduct as deceitful. Accordingly, the district court correctly decided that pursuant to the bond's own provisions, it no longer covered the fraudulent acts of Phipps during the time that he defrauded Muncy.

### II.

■■■ In a supplemental brief, Newhard raised an objection to the manner in which we are interpreting the termination clause. This objection was not litigated nor raised

in district court. We do not encourage the advocacy of new issues on appeal, particularly when the issues are raised in a supplemental brief. Nonetheless, we will consider the merits of Newhard's objection.

In its supplemental brief, Newhard noted that Missouri law required it to include a special rider to its insurance bond. *See* Mo.Rev.Stat. § 409.202(f) (1990) and 15 CSR 30–51.080(4) (repealed 1987). The pertinent language of this special rider stipulated:

> No cancellation or termination of this bond, whether by or at the request of the Insured or by the Underwriter, shall take effect prior to the expiration of the thirty days (30) after written notice of such cancellation or termination has been filed with the Missouri Securities Division, Jefferson City, Missouri unless an earlier date of such cancellation of termination is approved by said Securities Division.

Newhard argues that this language modifies the earlier discussed termination clause and requires that the Missouri Securities Division must be notified for the bond coverage to terminate.

We do not find this argument persuasive. Section 9 of the bond recognizes two forms of termination. The bond can either be terminated in its entirety or as to specific employees. This case involves the latter form of termination, but the special rider only applies to the former mode of termination.

The Section 9 termination provisions were part of a standard bond form which the Missouri Securities Division specifically required. *See* 15 C.S.R. 30–51.080(3) (repealed 1987). If notice to the Securities Division was required in cases like that before us, the Section 9 provision for immediate termination would be rendered superfluous. Section 9 of the policy expressly provides that coverage terminates "as soon as" the insured learns of an employee's dishonest acts. Such immediate termination cannot be squared with any notification requirement. Consequently, the special rider's notification requirement does not apply to this case.

Moreover, the immediate termination provision of Section 9 of the bond rests upon the policy that the employer should responsibly supervise its employees, particularly since the insured is in a better position than the insurer to monitor the activities of its employees. By terminating indemnification for the further fraudulent conduct of an employee after the employer has learned that the employee defrauded clients, the termination clause encourages employers to supervise their employees. This incentive minimizes fraud, thus, benefiting both the investment industry and its customers. If the special rider is interpreted to eliminate immediate termination, these benefits diminish, and this certainly cannot be the intent of the special rider.

### III.

In conclusion, we affirm the decision of the district court on the basis of the Section 9 termination provision.